First case this morning is People v. LaGrone. It's 4-1-0-0-2-1-2. For the appellant, Jacqueline Bullard. For the appellant, Anastasia Brooks. Ms. Bullard. May it please the court, counsel. My name is Jacqueline Bullard with the Office of the State Appellate Defender and I represent the defendant in this case, Maurice LaGrone. At the outset, I think it's important to acknowledge that this case involves a horrific tragedy. But this case, at this point in the proceedings, involves a procedural matter. It's important to consider whether Maurice LaGrone's Stage 2 post-conviction petition made a substantial showing of a constitutional violation. Whether trial counsel in failing to tender a lesser-included offense instruction on child endangerment rendered ineffective assistance under the Strickland standard. In this case, the petition meets each of the three criteria for advancing this petition to Stage 3. First, error is demonstrated. Mr. LaGrone would have been entitled to a child endangerment instruction had such an instruction been tendered. Second, counsel's failure to tender this instruction in this case was not a matter of trial strategy but was based on mistake. And finally, Mr. LaGrone was prejudiced by counsel's error. On the issue of whether Mr. LaGrone was entitled to a lesser-included offense on child endangerment, that issue is decided based on the charging instrument approach, which is a two-part inquiry. The inquiry first asks whether the charging instrument in the case sets forth the broad outline of the lesser-included offense. The second prong of the inquiry asks whether any reasonable jury could convict the defendant of the lesser-included offense while at the same time acquitting him of the greater offense. The charging instrument approach is a rather broad approach to interpreting whether a lesser-included offense is covered. The charging instrument need not set forth explicitly every element of the lesser offense. It is enough that those elements are implicitly contained in the charging instrument. And even slight evidence is enough to warrant an instruction under these circumstances. In this case, the difference between the charge defenses, the three types of murder that were charged in this case, and child endangerment turns on the mens rea of the case. The act is the same, causing the car to enter the lake, resulting in the death of the children. That is the act that the state is essentially charged in every count. They allege that this had been done intentionally, knowing, or the defendant knew of the strong probability that the death or great bodily harm would result. Child endangerment, on the other hand, calls for, those elements are satisfied if the defendant causes a child to be put in danger, that the defendant was aware of a possibility of harm, a mere possibility of harm, and that a death results, which in turn elevates this otherwise misdemeanor offense into a felony offense. One helpful way to think about this in terms of looking at whether the charging instrument in this case sets forth the broad outlines of the offense of child endangerment is to take the actual language that is used in the case and substitute out the intentional knowing and substantial probability mental states and substitute in, and the defendant knew there was a possibility of harm that would result. If the charging instrument read in that way, there would be no argument to be made that that charging instrument didn't fully satisfy the requirements necessary to charge a defendant with that offense, to charge the defendant with child endangerment. In this case, on the second prong of the charging instrument approach, a reasonable jury could have found Mr. Lebron guilty of child endangerment, but not guilty of first degree murder. Again, turning on the mens rea in the case, whether this act was done intentionally, or whether this was an act of colossal stupidity that ended in tragic results. The evidence in the case was there was evidence that Mr. Lebron himself testified that he was aware of some risk when he pulled the car quickly onto the ramp, parked so close to the water. This case isn't about where he parked the car, though, is it? No, it is that cluster of facts that led to that car going in the lake, which is parking too close in a car that when you put the car in reverse didn't stay put, but rolled forward if it was on a forward incline. It was about when Ms. Hamm told Mr. Lebron, put one foot on the brake and one foot on the gas so that you've got your foot on the brake as you're trying to back up. Rather than doing that, he knew better and he decided he was going to back up the car the way he wanted to. The question for the jury was whether he intentionally caused the car to go into the water. Yes. Not where he parked it, not how he put it in reverse, or when he put his foot on the brake. Isn't that right? Yes. Well, it seems your argument is trying to focus on conduct that really has nothing to do with the issue that was before the jury. The act was raised. Yes, and I would agree with you. I don't think that there was any dispute that Mr. Lebron was responsible for that car entering the lake. His actions caused that car to go into the lake. And the question is, what could the state prove beyond a reasonable doubt was his intent at that moment that his actions caused the car to go into the lake? Was it intentional? Did he know that that car was going in? Did he know that there was a strong probability of death or bodily harm? All three of those charges essentially mean Mr. Lebron intended for that car to go into the lake, intended to kill those children. The strong probability of death or great bodily harm, it skates right on the edge of intention and knowing. This was a, this was, was this guy sure, pretty sure that this car was going in the lake? Or he didn't know that that was going to happen when the car went in the lake. And that's the difference between child endangerment and first degree murder. And the jury was entitled to make that determination. The test under the, the charging instrument approach is a broad, is a broad test. And there's a reason for that. Because especially in these sort of highly inflammatory, emotionally charged cases like this, it is, it would be very difficult for a jury to walk away and not let anyone take responsibility for this, for what, for what happened here. And it's, the U.S. Supreme Court has recognized that in cases like this, it is possible that a jury, if it's leaning one way or the other, is going to find guilt. Because somebody has to, and that's why getting a lesser included offense instruction is so important. You let, you give the jury all of the options that are available to them. You don't run the risk. In a case like this, you don't need a psychological expert like, like Mr. LeBron had to know that it is human nature to want to blame somebody when something this horrible happens. But the law saves us from ourselves in that respect. The law makes us stand back and makes us say, we're going to give somebody a fair trial. And we're going to make sure that the attorney who represents him tenders all of the instructions that are necessary to make sure that that trial was fair. In this case, it was not a matter of trial strategy. Mr. Justice was very clear that, that, that he and an attorney from OSAD and another attorney discussed with Mr. LeBron, what's our strategy going to be? Are we going to go all for nothing, or are we going to ask for lesser included offenses in this case? And they decided, we're asking for lesser included offenses in this case. We have to give the jury another option besides first degree murder. What they did is they tendered the wrong lesser included offense instruction. They tendered a lesser included offense instruction that had as a mens rea recklessness. And there wasn't, this court found that there wasn't sufficient evidence in the record that Mr. LeBron knew that it was likely that the car would go into the lake. But what the record in this case does show is that there was evidence at trial that Mr. LeBron was aware that there was a possibility of the car going in the lake. And that is a classic case of child endangerment. Was Amanda Hinn charged with child endangerment? She got a lesser included offense on child endangerment. She was not charged with it then, but she received a lesser included. Yes, Your Honor. Were her charges verbatim the same except they used the theory of accountability as those charges here? Yes, Your Honor. They used the theory of accountability in the case. And they didn't, I don't believe they asked for death in that case. I could be mistaken about that. And I acknowledge the state's correct. You can't compare, there is a little bit of a sense of comparing apples and oranges in this case because the state did proceed on a theory of accountability against her as opposed to not using the theory of accountability in this case. But I think that it suggests what might have happened in this case because essentially in Amanda Hinn's case, again, there was no dispute that that car went in the lake. That it was, that that's what caused the death at the Actus Reis occurred. It was really about what was going on in the heads of these two people when that happened. And the jury rejected the notion that there had been any sort of frequency plan to do away with the children. Again, touch very briefly on the notion that this wasn't strategy. Did the state object to the instruction in Amanda Hinn's case of child endangerment? I don't know. Was it the same trial, Judge? And I don't know the answer. I believe it was the same trial, Judge, but I'm not sure if it was or not. But again, I don't think that has any effect on this case because on this case what we're dealing with is the record that we have before us. The trial that did take place. And whether that evidence was enough that a reasonable jury could have found Mr. LeBron guilty of child endangerment but not guilty of first degree murder. And then finally, so that I think that at this stage, at stage two at PC, that it's very clear that this was not, that this was a mistake that counsel made. Counsel just thought that child endangerment didn't apply in this case. Based on, I think we can assume, what was the old version of the statute that only applied to caregivers. And the fact that the defense also sought other lesser-included offenses. This was the strategy to seek lesser-included offenses. And then finally, this case involves a substantial showing that Mr. LeBron was prejudiced by counsel's error. The denial of a lesser-included offense instruction, the case law that governs that when a trial court denies a lesser-included offense instruction, is one of the few instances that, where it's really quite beneficial to the defendant. It's not, you don't have to prove, you don't have to overcome this incredibly high burden that the outcome of the trial would have been different if the instruction had been tendered. Instead, what the prejudice prong when a defendant is deprived of a lesser-included offense instruction involves is, could a reasonable jury have found guilt on the lesser and not guilt on the greater? And in this case, there's a substantial amount of evidence that would have allowed the jury to do that. And it was a matter of credibility. There was conflicting testimony on the particular factors that dealt with Mr. LeBron's mental state at the time. He testified he didn't intend to kill the children. He testified that there was, that he was aware of some risk. The circumstantial evidence supported that in terms of Ms. Hamm's, her statements. His actions afterwards, while there were some witnesses who testified that he was a cold fish, there were other witnesses, including a newspaper reporter who's probably the most objective person on the scene, who testifies that Mr. LeBron was distraught at the scene, that he was crying, that he was comforting Ms. Hamm. At the hospital, you have, both at the scene and at the hospital, you have witnesses. Mr. LeBron testified at trial that he went and made one attempt to get in the water and get in the car, and panicked and then came back out. That's consistent with witness testimony, that he was wet, that both he and Ms. Hamm were wet when they came out of the water. There are other witnesses who testified they were dry as a bone. We didn't see that they weren't wet at all. So again, it's another issue of credibility that a jury should be allowed to make that determination. There were witnesses who testified that he behaved in a loving manner towards the children. There were witnesses who testified that he didn't. There was expert testimony that the defendant was a poor responder in terms of dealing with the crisis. And that's consistent with the whole notion that he, which I think is one of the things that's difficult to get your head around in this case, is why didn't they go back in and try to save those children? Do I understand the evidence the rescue people were able to extract the children from the car in two to three minutes? They were, Your Honor, but it wasn't as, it was not as simple a procedure as that two minutes suggests. And were the children were in the car that was about four feet deep? They were in the back seat of the car. And that was about four feet. The trunk of the car was about that high and the front of the car was in seven feet. I don't recall any testimony that talked about somebody did a measurement of the water. But what we do know is that one rescuer said that he had a six foot something rescuer was standing in shoulder deep water. Another rescuer had to tread water in order to participate in the rescue. It wasn't a matter of just going and opening those doors. There was one rescuer who testified, I tried to get into the driver's door. I couldn't even find a handle. He had to swim over the hood of the car to go and assist another rescuer that was on the passenger side of the car. And although all three of the rescuers testified at trial that the ramp was dry and we didn't have any problem walking up, but each of those rescuers were impeached with their statements from pretrial depositions in which they described that ramp as slick. And one of the rescuers went so far to say is when I was coming out of the water, I had to use my hands to pull myself up on the grooves of the pavement to get out of the water. So although the rescue took two minutes, that doesn't suggest that this was an easy rescue or that it would have been easy for Mr. LeBron to have saved the children if he had gone back a second or a third or a fourth time. There was also, again, there was psychological testimony that killing the children in order to provide him with a lifestyle to which he had become accustomed was outside of his psychological makeup, that given his psychological makeup, he was the kind of guy who would normally walk away and latch on to another woman to take advantage of. For all of those reasons, I think that the evidence really on this issue of the mens rea was very closely balanced. And this case warrants a remand for a Stage 3 evidentiary hearing. The stakes are high in this case. It is the difference between Mr. LeBron spending decades in prison and Mr. LeBron dying in prison, spending the rest of his life in prison. The stakes are high, the evidence is close, and the jury deserved to have every available instruction to them so their verdict could accurately reflect what they really believed happened in this case. Does this court have any further questions? I see none, but you will have rebuttal. All right. Thank you. Ms. Brooks. Excuse me. May it please the court and counsel. My name is Anastasia Brooks, and I represent the people in this case. Counsel phrased the question as whether his petition and his affidavits had made a substantial showing of constitutional violation to survive the motion to dismiss, which means that it would be important to actually examine the petition and the contents of the affidavit to see exactly what Mr. LeBron has alleged that is the error that he is raising in this case. And the affidavit he attaches is that Jeff Justice decided the strategy to offer a lesser included defense instruction. And the claim raised in the petition is that Jeff Justice failed to tender child endangerment as a lesser included defense instruction. So it's not an allegation under a case like Rocksmith, for example, that the defendant was being deprived of his ability to make the ultimate decision as to whether to tender that particular instruction. And the petition makes no allegation that Jeff Justice had given him erroneous advice in making that decision or on page 7 of the defendant's reply brief, they phrased the issue as if they had alleged and provided an affidavit to the effect that the defendant had asked his counsel to tender instructions on all applicable included offenses. And that's from their reply brief at page 7, but yet there's nothing in their petition to that effect. There's no showing in the petition or allegation that would have to be taken as true at this stage in the proceeding that that's in fact what the defendant had asked his attorneys to do, research and tender every possible included defense instruction that was available. That's not the allegation, that's not the petition, and that's not the issue in this case. So therefore the state's response had gone along the lines of the traditional analysis of when an allegation is that the counsel had failed to do something, then consider whether it may have been valid trial strategy or at least, even if it were mistaken, not strategic based on a misapprehension of law, it would have been nonetheless an objectively reasonable decision to make under the circumstances. And that would then involve the analysis of whether any competent counsel in a hypothetical sense could have reached the same conclusion if found burdened by the particular misapprehension of law that the counsel was operating under. So this was a decision that some competent counsel could have made because there was a situation where if you're tendering a lesser included offense, you're essentially stipulating that the evidence would be sufficient to find the elements of that offense beyond a reasonable doubt. Well, one of the elements of knowing child endangerment under the charge of this case, the charged actus reus is putting the car into the water. If the offense is willful child endangerment, that mens rea is the mens rea of willfulness, which is equivalent to knowledge. So essentially the allegation of child endangerment under the particular act that was charged would be that he willfully and knowingly put the car into the water. Now the difference between those two offenses is that under first degree murder, there has to be knowledge and strong probability of death or great bodily harm. Now risks abound in the world, so it's not a situation where if I drive children over a bridge and there's some hypothetical possibility that the bridge might collapse, that makes me guilty of misdemeanor child endangerment simply for driving my children over, if I had any children or any children, over a bridge, that that would be willful child endangerment. That's not the nature of that offense. It has to be a substantial enough risk to support criminal conviction. Letting your children walk to the market, if it's not a busy street. I mean, it's a very fact-intensive analysis. Exposing your children to any hypothetical or possible risk is not willful child endangerment. However, the allegation here is that he would have been that he willfully put the car in the lake. Now, however, if you put an occupied car with children of young age who are strapped in the back seat into a lake on a ramp such as this, there can be no jury question that what the defendant knew at the time would have been at least a strong probability of death or great bodily harm. It's a very low standard by comparison to what would be required for a willful child endangerment conviction. So, in other words, the charge does identify willful child endangerment in the sense that if the defendant had willfully put the car into the water, knowing that there was a risk of death or bodily harm, that would be willful child endangerment. However, the evidence does not permit that instruction to be tendered under the facts of this case because the risk would have been so great and the harm would have been so great that there was no possibility a reasonable jury could have found him not guilty of murder while at the same time convicting him of lesser offense of child endangerment under these facts. So it's a situation where there's not no possibility. Well, you say it couldn't have happened, but it happened in the co-defendant's case. Well, the difference in the co-defense case was not disclosed in the record. In other words, there were different rules. For example, Amanda Hamm wasn't driving. And I'm not sure exactly what the basis would have been for submission of a child endangerment offense instruction in that case. If, for example, it had been that Amanda Hamm had endangered the children for exposing them to Maurice LeBrun, who intended to kill her kids, then that would have been child endangerment. However, it wouldn't have been a lesser included because it would not have been based on the act that was charged in the indictment. However, just because Amanda Hamm received an error in her favor doesn't mean that there's strickland prejudice in this case. So you're saying it was error for her to have received that instruction? I can see no way under the facts that are disclosed in this record. The other thing is she was tried separately. So there may have been separate evidence that was admitted against her in terms of what statements she had made to authorities, for example, versus the statements the defendant made to authorities. So the evidence would not have been completely admissible each way. For example, Amanda Hamm's confession was not allowed in this case, whereas defendant's statements to investigators might not have been allowed in her case because they would have been statements that she made. They would have been hearsay, for example. But the fact is that strickland prejudice requires that the defendant be denied a fair trial and that essentially if the allegation that he's making now is that he should have received the same opportunity for the judge to make an error in his favor that Amanda Hamm received, that is not strickland prejudice. Opportunity to receive an error in your favor is not strickland prejudice. It doesn't deny the defendant a right to which he was entitled. So for that reason, the reference to Amanda Hamm's result is not strickland prejudice. And the other thing about strickland prejudice while I'm on the subject is the Sanders case, and I understand it's only persuasive because it's from the jurisdiction of Florida, but the analysis is directly on point here. And they found as a matter of law, and they apply strickland too, like Illinois does, the lost opportunity to receive what is essentially a jury pardon, the opportunity for jurors to compromise their verdict by disregarding the evidence of guilt on the greater offense. Understanding, of course, that the jury of which defendant received in fact convicted him. And under strickland, you have to exclude such possibilities as juror compromise when analyzing the likelihood of a more favorable result. So when the only allegation is that the jury was not presented with an additional option, that is the possibility of compromising their verdict. There's no reasonable probability that the same jurors who had reached a verdict of guilty on the exact same evidence was going to reach a not guilty verdict on the exact same evidence. The allegation is that the same jurors guilty on murder would now say not guilty on murder and only guilty on the lesser offense. There has to be some showing that there was a difference in evidence that would have presented a different theory of the case, for example, because the defense here was it was an accident. He might have been negligent, he might have been reckless, but it was still a tragic accident. That was the theory from the beginning to the end of the defense case. Now, if the theory would be something different, the testimony, I don't know if the defendant wants to perjure himself by saying now that it wasn't an accident, he actually willfully put the car in the water. I'm not sure what the defendant can do to change his testimony, but there's no allegation here that the defense should have put forward some different theory of the case or different evidence. The only allegation is he should have presented the jurors with an additional option. If the evidence is the same, there's no way under Strickland he can get a different result. As a matter of law, according to Sanders, and that same analysis should be applied here in Illinois. So for that respect, there's no reasonable probability and there's no, it does not undermine the confidence of the verdict. And the defense brief wanted to cite the remarks of the jurors. I'm not sure that's appropriate. It seems like there's no real authority in this case for doing so, but to the extent that those jurors' remarks should be considered, those remarks indicated that the jurors were unanimous, definitely unanimous on the third count, which would be knowing murder, strong probability murder. If they're definitely unanimous on that, there's no way they could have compromised this verdict if they were given another option. So for those reasons, as well as the evidence, while we're on this subject, in terms of evidence of the guilt, the major testimony, the major evidence here against him was his own words, what he testified to, his own lies. And when he described the car going into the water, he said it spun like on gravel, and then the car went into the water, which is something that was never able to be reenacted, not only by the prosecutors, reenactors, but by his own defense expert. Could not get the tires to spin before the front end lifted because it was now floating. Well, how much time does it take to float? It takes 4.2 seconds. The defendant characterizes that as a very short time, but if you're just simply moving your foot from the brake pedal to the accelerator pedal, 4.2 seconds is an eternity. In fact, enough time for the car not only to hit the water, enter the water, and be three feet into the water, and then have the car start floating. And at that point, now the point of no return. Hitting the accelerator pedal will do no good. It will simply spin the wheels because there's no contact anymore. That front end of the car is lifted up. It is now floating out. And until the defendant opens the car door to get out, then it takes on water and sinks rapidly. So at that point, the defendant's testimony was essentially rebutted by the physical evidence. The reenactments, his own reenactments, shows that the only way for this car to get into the water was if he let it roll in, if he didn't try to accelerate at all. And that is essentially what his reenactors showed. They said that's the only way it could have happened that way. And the defendant's own testimony, it spun like on gravel before it hit the water, could not have happened. So it seems like he has no way to defend himself from the physical evidence. And the timing, what happened afterwards. The timing of the 911 call and when Darren Leggett, the boater, approaches. And them standing by and the testimony of Amanda Hamm's aunt about how they didn't do anything to act to save these children as they were drowning. And the defendant's own testimony where he talked about how he stood there and watched as these children started going under the water. And he couldn't bear himself to stand there and watch that. So he went up to Amanda Hamm, ostensibly to give her help with finding the location so that the 911 operators would know where to go. But of course, he's now trapped by a dilemma of his own making. Why in the world did they go out to a deserted area at that time of the night, wait until the last person leaves, several minutes, and then take the spot on the ramp? And he wanted to go home and smoke marijuana and watch movies. He didn't want to go out there. It was supposed to be Amanda Hamm's idea. Now he's in charge. He likes, according to what they call jailhouse snitches, to control white women. Who Amanda Hamm was white. So essentially, if that were the case, why is he acceding, speeding on a suspended license, out to this remote area and doing a stupid thing, parking on the boat ramp? And then the fact that they waited around. Legate starts coming. They see the light. They better go call 911. But as they said, the defendant said he'd never been there before, which is disputed by the jailhouse testimony, which was that the defendant admitted that they had actually cased this place the week before, but it was too busy. Now this is the week after Labor Day, so it's dead. The summer season is over. But he said that Amanda Hamm gave him the directions. He'd never been there. He didn't know where it was. But essentially, the reason why he's leaving those children down in the water is because he said Amanda Hamm was having trouble with the directions. But he also claimed at the same time he didn't know how to get there. He didn't know where this place was at. So it's just patently unreasonable. The whole explanation for how the car got in the water and what happened afterwards, and it seems like what really happened, the more likely explanation that could be inferred is that he was keeping her from going back into the water to save her children, so she went up and called 911. But that's just an inference from the record. So with respect to the other issues, I just wanted to make comments about, the defendants may know showing that even if he had alleged the failure of erroneous advice by the counsel, he hasn't shown that prevailing norms would show that the defense attorney has a duty in essentially every single case that goes to a jury trial to advise the defendant of every possible conceivable, lesser-included defense instruction, scaring the entire criminal code, for example, so that the defendant can then make an intelligent and reasoned choice about which to tender. Essentially, if that's the defendant's job, if the defendant gets that chance to tender in the instructions, then the defense's position now is that the defendant is entitled  So there's no showing that somehow that that's a duty, that the first pronged Strickland ineffective assistance, unreasonable assistance, not to do so, and not to do it perfectly, essentially, that the allegation here is that the counsel made a mistake. Well, Strickland doesn't require perfection. And also, Strickland says there's countless ways to provide effective assistance. In this case, it was litigated up and down the line with experts and several pretrial motions, and the counsel did everything he could to try to secure an acquittal for his client, except for this one thing that now the defendant complains about. But, of course, Kimmelman v. Morrison says that you have to consider counsel's overall performance in making the performance inquiry at Strickland. So the fact that now that the defendant seems to be relying on separate and incidental acts in exchange for, in support of a child endangerment instruction is not going to give him that instruction and that would not have been something that counsel would have had a duty to tender based on the allegations that he parked too close to the water or that he didn't hit the accelerator hard enough or whatever the theory would have been. So for those reasons, even if that were charged, that's something that the standard of knowledge is that the defendant has to be consciously aware that his conduct is of a certain nature, that would constitute the crime, or that he's consciously aware that the result is practically certain to be caused by his conduct. So the defendant says here at argument that child endangerment would have been committed if he did not know that the car was going to go into the lake. Well, he might have committed child endangerment by parking too close to the water, but that wasn't the lesson included. That was a separate and incidental crime that was not charged, unlike Belknap, for example, which child endangerment was charged on a separate incidental conduct to the crime and the murder in that case. However, here, if he didn't know what was going to happen, then he's not guilty of willful child endangerment because he doesn't have the mental state of knowledge. So that would not actually constitute the offense of which he's trying to establish. So I just want to make sure that I've made all of my points I want to make. So that appears to take care of it. I would entertain any questions if you have any. Seeing none, thank you. Thank you, Your Honors. Appreciate it. The bottle, please. Just a few quick points. I want to make clear the defendant is not asking for jury nullification in this case. The defendant maintains that the evidence in the record would support a finding of guilt on the offense of child endangerment based on the mens rea. The state, when it talks about the actus reus of the crime, conflates the mens rea and the actus reus. She talks about that if the defendant willfully put the car in the lake, then he would know that there was certainly going to be death or great bodily harm that was going to result from that. But the act itself, you have to separate the defendant's intent from the act itself. The act itself is the physical things that Maurice Legrone did caused that car to go into the lake. And by either not backing carefully, by smoking dope that morning, he was responsible for that car moving in the lake. But the question is, what was his mental state at the time? And so causing is a much broader term than willfully knowing that that car is going to go in the lake. In terms of counsel's trial strategy, the state argues that instruction on child endangerment would have been inconsistent with the defense's theory of accident. The same is true of the reckless state of mind that was contained in reckless homicide that the defense tried to get in as a lesser included offense. So the fact that the defense ultimately argued to the jury this was an accident, that's their best shot because that gets the defendant completely acquitted. You can ask a jury for acquittal based on accident and also proceed on alternate theories of mental state. And the case law is actually really clear on that. In terms of requesting lesser included offenses, the defense can ask for lesser included offenses even when those lesser included offenses the mental states conflict with, otherwise conflict with the theory of the case. The most obvious examples being second degree murder, which includes an intent to kill and then the reckless charge, which doesn't. And then finally the state points to some of the physical evidence which the state says rebuts the defendant's case. Again, the standard in this case was there some evidence that the defendant didn't possess the requisite mental state for first degree murder. And I would just comment very briefly on the whole notion that the defendant testified that the tires spun, but the expert said they didn't spin on gravel, they spun once the front end of the car lifted off. Somebody who's sitting in a car that's entered the lake, I think it's not realistic to think that you're going to get a perfectly accurate accounting of what happened because of the shock of what's occurred when the car goes into the lake. And then finally the state argues that Strickland doesn't require perfection. And I would agree with that. Strickland does not require perfection. But Strickland requires a defense attorney at a minimum to be familiar with lesser included defense instructions. And if he's not, it necessitates researching. That's what defense attorneys do. Our clients come to us for accurate advice. And that's not perfection, that's a basic duty of competence that's owed to all defendants. Okay, thanks to both of you. The case is submitted. The court stands in recess.